**GRANT & EISENHOFER P.A.**
M. Elizabeth Graham (SBN 143085)
One Market Street
Spear Tower, 36th Floor
San Francisco, California 94105
Tel: 415-293-8210
Fax: 415-789-4367
egraham@gelaw.com

*Additional Counsel for Plaintiff on
Signature Page*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| ROSETTE PAMBAKIAN,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY BLATT, et al.<br><br>Defendants. | CASE NO. 2:19-cv-07053<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY LITIGATION**<br><br>Judge:  Hon. Michael W. Fitzgerald<br>Courtroom:  5A<br>Date:  November 4, 2019<br>Time:  10:00 a.m. |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 4, 2019, at 10:00 a.m., or as soon thereafter as the parties may be heard, in Courtroom 5A of the United States District Court for the Central District of California, located at 350 West First Street, 10th Floor, Los Angeles, California, Plaintiff, Rosette Pambakian, requests this court for an Order denying Defendants' Motion to Compel Arbitration and to Dismiss or Stay Litigation [Doc. 30].

---

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................... ii

I.    INTRODUCTION ................................................................ 1

II.   STATEMENT OF FACTS ................................................... 2

    A.    PLAINTIFF WAS SEXUALLY ASSAULTED BY BLATT, AND IAC AND MATCH FAILED TO CONDUCT A MEANINGFUL INVESTIGATION INTO THE ASSAULT ........................................................... 2

    B.    THE AGREEMENT WAS FOISTED UPON PLAINTIFF UNDER OPPRESSIVE CIRCUMSTANCES AND SUSPICIOUS TIMING ................... 5

    C.    AFTER PLAINTIFF FILED THE SEXUAL ASSAULT COMPLAINT, DEFENDANT BLATT FILED A RETALIATORY DEFAMATION SUIT AGAINST PLAINTIFF IN FEDERAL COURT ............................... 6

    D.    DEFENDANTS' DEMANDS FOR ARBITRATION WITH THE AAA ARE CURRENTLY STAYED ............................................................. 7

    E.    THE NEW YORK VALUATION LAWSUIT IS UNRELATED TO PLAINTIFF'S SEXUAL ASSAULT CLAIMS ............................... 7

III.  ARGUMENT ........................................................................ 8

    A.    THE COURT MUST DECIDE WHETHER A VALID ARBITRATION AGREEMENT EXISTS AND WHETHER IT ENCOMPASSES CLAIMS ARISING FROM THE ASSAULT .......................................... 8

    B.    THE COURT SHOULD DENY THE MOTION BECAUSE THE AGREEMENT IS INVALID AND UNENFORCEABLE ........................... 10

        1.    The Agreement Does Not Apply Retroactively To Plaintiff's Claims ........................................................... 10

        2.    The Agreement Is Unconscionable ....................................... 12

               (a)    The Agreement Is Procedurally Unconscionable ........ 14

               (b)    The Agreement Is Substantively Unconscionable ...... 17

               (c)    Public Policy Concerns Warrant Denying The Motion To Compel Arbitration .............................. 21

    C.    DEFENDANTS CANNOT ENFORCE THE AGREEMENT BECAUSE THEY ARE IN BREACH ................................................................ 21

    D.    BLATT WAIVED HIS RIGHT TO ENFORCE THE AGREEMENT ............. 23

    E.    DEFENDANTS' EQUITABLE ESTOPPEL ARGUMENT MUST BE REJECTED .................................................................. 24

IV.  CONCLUSION .................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Armendariz v. Foundation Health Psychcare Services, Inc.*,
24 Cal. 4th 83 (2000) ................................................................................. 13, 14

*Armstrong v. Michaels Stores, Inc.*,
2018 WL 6505997 (N.D. Cal. Dec. 11, 2018) ................................................ 9

*Aviles v. Quik Pick Express, LLC*,
2015 WL 9810998 (C.D. Cal. Dec. 3, 2015) (Fitzgerald, J.),
*vacated on other grounds*, 703 F. App'x 631 (9th Cir. 2017) ......................... 9

*Bischoff v. DirecTV, Inc.*,
180 F. Supp. 2d 1097 (C.D. Cal. 2002) ......................................................... 13

*Boucher v. Alliance Title Co., Inc.*,
127 Cal. App. 4th 262 (2005) ........................................................................ 25

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ....................................................................... 18

*Brown v. Dillard's, Inc.*,
430 F.3d 1004 (9th Cir. 2005) ............................................................. 8, 21, 22

*Bustamante v. Intuit, Inc.*,
141 Cal. App. 4th 199 (2006) ........................................................................ 15

*Carbajal v. CWPSC, Inc.*,
245 Cal. App. 4th 227 (2016) ........................................................................ 20

*Circuit City Stores, Inc. v. Adams*,
279 F.3d 889 (9th Cir. 2002) ................................................................... 14, 18

*Davis v. O'Melveny & Myers*,
485 F.3d 1066 (9th Cir. 2007) (abrogated on other grounds) ....................... 17

*De La Torre v. CashCall*,
5 Cal. 5th 966, 976 ................................................................................... 17, 18

*Eiess v. USAA Fed. Sav. Bank*,
2019 WL 3997463 (N.D. Cal. Aug. 23, 2019) ................................................ 9

*Fitz v. NCR Corp.*,
118 Cal. App. 4th 702 (2004) ................................................................. *passim*

*Flores v. Nature's Best Distribution, LLC*,
7 Cal. App. 5th 1, 10-11 (2016) .................................................................... 15

*Goldman v. KMPG LLP*,
173 Cal. App. 4th 209 (2009) ........................................................................ 25

ii

*Goldman, Sachs & Co. v. City of Reno,*
747 F.3d 733 (9th Cir. 2014) ........................................................ 9

*Gutierrez v. Autowest, Inc.,*
114 Cal. App. 4th 84 (2003) ......................................................... 16

*Harper v. Ultimo,*
113 Cal. App. 4th 1402 (2003) ............................................... 15, 16

*Ingle v. Circuit City Stores, Inc.,*
328 F.3d 1165 (9th Cir. 2003) ................................................ 17, 18

*Lifescan, Inc. v. Premier Diabetic Servs., Inc.,*
363 F.3d 1010 (9th Cir. 2004) ....................................................... 8

*Long v. Fid. Water Sys., Inc.,*
2000 WL 989914 (N.D. Cal. May 26, 2000) .................................. 11

*Magno v. College Network, Inc.,*
1 Cal. App. 5th 277, 284 (2016) ................................................... 17

*Martin v. Yasuda,*
829 F.3d 1118 (9th Cir. 2016) ................................................ 23, 24

*Mercuro v. Superior Court,*
96 Cal. App. 4th 167, 176 (2002) ................................................. 19

*Mohebbi v. Khazen,*
2014 WL 6845477 (N.D. Cal. Dec. 4, 2014) ................................. 11

*Morse v. ServiceMaster Global Holdings Inc.,*
2012 WL 4755035 (N.D. Cal. Oct. 4, 2012) ............................. 10, 12

*Nagrampa v. MailCoups, Inc.,*
469 F.3d 1257 (9th Cir. 2006) ....................................................... 8

*Neal v. State Farm Ins. Cos.,*
188 Cal. App. 2d 690 (1961) ........................................................ 13

*Oracle Am., Inc. v. Myriad Grp. A.G.,*
724 F.3d 1069 (9th Cir. 2013) ....................................................... 9

*Patterson v. ITT Consumer Financial Corp.,*
14 Cal. App. 4th 1659 (1993) ....................................................... 16

*Peleg v. Neiman Marcus Grp., Inc.,*
204 Cal. App. 4th 1425 (2012) ..................................................... 18

*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC,*
55 Cal. 4th 223 (2012) ................................................................. 14

*Russell v. Citigroup, Inc.,*
748 F.3d 677 (6th Cir. 2014) ....................................................... 11

iii

*Salgado v. Carrows Rests., Inc.*,
  33 Cal. App. 5th 356 (2019)................................................................ 12

*Sanchez v. Valencia Holding Co., LLC*,
  61 Cal.4th 899 (2015)....................................................................... 15

*Sanchez v. W. Pizza Enterprises, Inc.*,
  172 Cal. App. 4th 154 (2009) (abrogated on other grounds)........................ 23

*Sanfilippo v. Tinder, Inc.*,
  2018 WL 6681197 (C.D. Cal. Dec. 18, 2018) ....................................... 12

*Steiner v. Horizon Moving Sys., Inc.*,
  2008 WL 4822774 (C.D. Cal. Oct. 30, 2008) ....................................... 24

*Stirlen v. Supercuts, Inc.*,
  51 Cal. App. 4th 1519 (1997)............................................................. 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2011 WL 3353867 (N.D. Cal. Aug. 3, 2011)......................................... 11

*Tompkins v. 23andMe, Inc.*,
  2014 WL 2903752 (N.D. Cal. June 25, 2014) ......................................... 9

*Wiz Tech., Inc. v. Coopers & Lybrand*,
  106 Cal. App. 4th 1 (2003)........................................................... 21, 23

**Statutes**

9 U.S.C. § 2................................................................................... 8

# I.     INTRODUCTION

Plaintiff Rosette Pambakian's claims all stem from the 2016 sexual assault that Ms. Pambakian suffered at the hands of Defendant Greg Blatt in a hotel room after a Tinder holiday party, and the subsequent cover-up by Defendants Match and IAC, whose interest was in protecting Blatt, their CEO, rather than Ms. Pambakian.   The claims cannot be shoehorned into an employment arbitration agreement that only became effective more than a year *after* these events (the "Agreement").  That Agreement does not cover her claims here.

Further, the Agreement itself is unenforceable under California law. Match and IAC surreptitiously acquired Plaintiff's signature on the Agreement, as discussed herein.  Ms. Pambakian was duped into signing this Agreement only *after* she refused an offer of money to resolve the incident and refused to sign a Non-Disclosure Agreement ("NDA") pertaining to the assault.   Moreover, the Agreement contains numerous terms that courts routinely find unconscionable as a matter of law.

Finally, Defendants have forfeited their right to arbitrate by repeatedly breaching the Agreement.  This alone forms a basis for denial of Defendants' motion to compel employment arbitration.

Defendants' motion ignores these critical points and spins facts in an unfortunate effort to silence a victim of a physical sexual assault.  While such an effort is not new, as is seen all too often now in the wake of the #MeToo movement, it should not be countenanced.  Keeping Plaintiff's story behind closed arbitration doors will prevent the public from knowing the truth about Mr. Blatt's conduct. Plaintiff has bravely sacrificed her reputation, livelihood, and personal privacy in her effort to hold Defendants accountable for their misconduct.  The Court should not let Defendants' tactics cause Plaintiff any more harm than she has already endured.  The Motion should be denied.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO
COMPEL ARBITRATION AND DISMISS OR STAY LITIGATION

Case No. 2:19-cv-07053

## II.   STATEMENT OF FACTS

### A.   PLAINTIFF WAS SEXUALLY ASSAULTED BY BLATT, AND IAC AND MATCH FAILED TO CONDUCT A MEANINGFUL INVESTIGATION INTO THE ASSAULT

Plaintiff Rosette Pambakian was one of the longest-standing female executives at Tinder and a vital part of the growth and success of the Company. ¶¶1-2, 13.[1]  As Head of Communications, she helped build the Company into one of the most successful online dating apps on the market.  *Id*.

On December 9, 2016, Ms. Pambakian attended a holiday party for Tinder employees at the SLS Hotel, Beverly Hills, in Los Angeles, California.  ¶15. During the party, Defendant Blatt aggressively approached Plaintiff and, in an extremely lewd and suggestive voice, told Plaintiff that he "gets hard" every time he looks at her and asked her to "get out of here" together, which made Plaintiff believe that Blatt was propositioning her for sex.  ¶16.  Plaintiff was not only extremely uncomfortable, but also alarmed that Blatt might actually act on this unwanted sexual advance.  *Id*.  She quickly left the party with two friends and colleagues (referred to as Witness 1 and Witness 2) and went upstairs to Witness 1's hotel room to escape the awkward and uncomfortable situation with Blatt.  *Id*.

Blatt, however, persisted in pursuing Plaintiff.  Around 2:00 a.m. that night, Blatt texted Witness 1, Blatt's Executive Assistant, looking for them.  ¶17. Plaintiff asked Blatt's assistant not to tell Blatt where they were, but she did.  *Id*. Several minutes later, there was a knock at the hotel room door.  *Id*.  When Witness 1 opened the door, Blatt immediately climbed on top of Plaintiff, who was sitting on the bed, and, in front of both colleagues (who were also Plaintiff's subordinates), pulled her backwards onto the bed so that they were laying down and he was pressing against her. ¶18.  Blatt draped his arm over Plaintiff, forcibly grabbing her breasts and upper thighs, and began kissing her shoulders, neck and

---

[1] Unless otherwise noted, citations to "¶__" refer to paragraphs in Plaintiff's Complaint in this action.  *See* Graham Decl. Ex. 1.

chest.  *Id.*  Plaintiff did not consent to any of this behavior and was completely aghast.  Blatt then called for someone to "turn off the lights."  *Id.*  Acutely aware that her two subordinates were standing right there witnessing Blatt's horrific behavior, Plaintiff attempted to diffuse the situation by pulling away from Blatt, stating something to the effect of, "Ok, we're all hungry; I'm going to order food." *Id*.  Blatt finally let her up from the bed.  *Id.*

Blatt's unwanted advances, however, did not stop there.  While they were all waiting for the food to arrive, Blatt again pushed Plaintiff down onto the bed and began fondling and attempting to kiss her.  ¶19.  In an effort to fight off Blatt's unwanted sexual contact and escape, Plaintiff announced that it was time to leave and extracted herself from Blatt's grasp.  *Id*.  Witness 1 begged Plaintiff not to leave her alone with Blatt, so Plaintiff and Witness 2 waited with her in the hotel room until Blatt left the premises in his car service before they each caught their respective rides home.  *Id*.  Plaintiff did not consent to any of these unwanted sexual encounters with Blatt and was extremely distraught by what took place.

Given Blatt's position as both her boss and the CEO of Tinder and Match, Plaintiff knew that Blatt was a powerful man, and she had serious trepidations about making the details of her sexual assault public.  ¶¶20-21.  She spent many years cultivating her reputation in the tech industry and feared losing everything she had worked so hard for over the years.  *Id*.  To preserve both her own reputation and the reputation of Tinder, a company she cared deeply about, the next morning she asked her colleagues not to tell anyone about the assault.  ¶¶21-22.

Two days after the sexual assault, Blatt called Plaintiff into his office to apologize for his actions on the night of the party.  ¶23.  Because Plaintiff knew that she had to report to Blatt as CEO of Tinder and was concerned about the repercussions on her reputation if the assault were made public, Plaintiff decided to try and put the ordeal behind her and agreed to never speak of it again.  *Id*.

A few days later, Plaintiff told her supervisor, Vice President of Public Affairs for Match, about the assault. *Id* at ¶25. Although distraught, Plaintiff, a truly loyal employee, was concerned about the real possibility of a Tinder PR crisis if the situation became public, given that there were two witnesses. *Id*. Plaintiff's supervisor never reported Plaintiff's situation to human resources. ¶¶26-27.

In April 2017, Sean Rad, former CEO and then-Chairman of Tinder, got wind of the incident from multiple sources, including indirectly from Witness 1. ¶28. Rad asked Plaintiff about the rumors, and she confirmed and recounted the sexual assault as it happened at the hotel that night. *Id*. Mr. Rad reported Defendant Blatt's sexual assault of Plaintiff to the General Counsel for Defendant IAC and Chief Legal Officer of Defendant Match. ¶29.

On April 30, 2017, Plaintiff was approached by the Chief Human Resources Officer at Match and Tinder to discuss the assault. ¶37. After assurances of confidentiality, Plaintiff recounted her assault to the head of HR and Chief Legal Officer of Match. ¶38. Approximately three days later, on May 3, Plaintiff again recounted her assault to the Vice President and Associate General Counsel of IAC. ¶40. One day later, on May 4, Blatt reached out to Plaintiff and Witness 1 asking them to join him on a video conference. ¶41. Plaintiff did not attend the video conference, but Witness 1 did. ¶42. After the video conference, Witness 1 told Plaintiff that she no longer wanted to cooperate with the investigators because Blatt told her he was truly sorry and begged her not to continue with the investigation, as it would ruin his life and family. *Id*. After speaking with Witness 1, Plaintiff told the Chief Human Resources Officer that she no longer felt comfortable discussing the assault until she consulted with a lawyer, as it was clear that her confidentiality had been breached and they were releasing information to her attacker. ¶43. Following this communication, Plaintiff was never contacted about the investigation again. *Id*.

The investigation, however, was a sham.  Defendants IAC and Match were required under their own policies to conduct a meaningful investigation into "all relevant facts," but they failed to do so.  ¶51.  The investigation was spearheaded by two biased executives who were loyal to Blatt.  ¶29.  One of the two eye witnesses to the assault, Witness 2, was never interviewed, presumably because he was Plaintiff's employee and not seen as loyal to Blatt.  ¶45.

### B. THE AGREEMENT WAS FOISTED UPON PLAINTIFF UNDER OPPRESSIVE CIRCUMSTANCES AND SUSPICIOUS TIMING

In July 2017, Plaintiff was alerted that a reporter was investigating a story about sexual misconduct involving a high-level Match executive at Tinder.  ¶46. In August or September 2017, Plaintiff learned that the reporter was still investigating and that the story was about her assault.  *Id.*  Plaintiff informed Blatt and the Chief Human Resources Officer about the reporter's inquiry.  ¶47. Plaintiff's attacker, Defendant Blatt, asked Plaintiff to talk with the reporter and discuss how well Tinder was combatting sexual harassment at the Company and to try throwing her off the story.  *Id.*  Plaintiff refused to speak with the reporter directly to help cover up her own assault, so she directed the reporter to the Head of Communications at IAC.  *Id.*

After refusing to help cover up her assault in the press, in October 2017, Plaintiff was approached by the Chief Human Resources Officer of Match with an NDA.  ¶48.  Match offered Plaintiff an increase in compensation in exchange for her silence about Blatt's sexual assault, but she refused to sign.  *Id.*  Approximately two months later, in December 2017, Plaintiff learned that Blatt was resigning as Tinder's CEO and that it was likely because she would not sign the NDA.  ¶49. Also in December, unbeknownst to Tinder employees, including Plaintiff, Match adopted an alternative dispute resolution ("ADR") program.  Alcala Decl., Ex. B, Alcala-8.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO
COMPEL ARBITRATION AND DISMISS OR STAY LITIGATION                    Case No. 2:19-cv-07053

Just one month after Blatt purportedly resigned,[2] in January 2018, Plaintiff received an email containing a link to a DocuSign file with multiple Match and IAC policies, including, ***in order***:  (1) The Code of Business and Conduct and Ethics, (2) Securities Trading Policy, (3) Accounting and Auditing Matters, (4) Harassment, and (5) Alternative Dispute Program.  Pambakian Decl. at ¶¶1, 6, Ex. 1.  Plaintiff was asked to answer questions at the end of each electronic file to indicate her understanding of each policy ***except for one***—the Alternative Dispute Program.  *Id.* at Ex. 1.  IAC and Match never explained to Plaintiff or the other employees that these new policies contained an arbitration agreement.  *Id.* at ¶2.  There was no opportunity for Plaintiff or others to ask questions or negotiate any of the terms.  *Id.*  Plaintiff was forced to complete all sections of the DocuSign file, including signing the summary of the Agreement, in order to complete the file by Defendants' specified deadline.  *Id.* at ¶3.

### C.   AFTER PLAINTIFF FILED THE SEXUAL ASSAULT COMPLAINT, DEFENDANT BLATT FILED A RETALIATORY DEFAMATION SUIT AGAINST PLAINTIFF IN FEDERAL COURT

On August 5, 2019, Plaintiff filed suit against Defendants Blatt, IAC and Match in the Superior Court of California, Los Angeles County.  Graham Decl., ¶4, Ex. 1.  On August 13, Defendants removed the Complaint to this Court.  *Id.* at ¶5, Ex. 2.  The same day, Blatt filed a retaliatory Complaint against Plaintiff and Sean Rad for defamation and conspiracy in the Central District of California seeking damages in excess of $50 million.  *Id.* at ¶6, Ex. 3.  This suit is premised entirely upon statements that Ms. Pambakian and Sean Rad made in 2018 pertaining to allegations about the assault in a New York lawsuit.  It is clear to Plaintiff that this suit is another tacit threat, and yet another effort to silence her from telling the truth concerning the assault.

---

[2] While Defendants claim that Blatt "resigned" in December 2017, he retained his Tinder and Match email accounts, worked at IAC offices for several months, and continued to be actively involved in IAC/Match business.  Graham Decl., Ex. 1, ¶50.

6

### D. DEFENDANTS' DEMANDS FOR ARBITRATION WITH THE AAA ARE CURRENTLY STAYED

On August 19, 2019, Defendants' counsel contacted Plaintiff's counsel to set up a meet-and-confer teleconference regarding Defendants' planned Motion. Graham Decl., ¶8, Ex. 4.  On August 20, 2019, Plaintiff received a letter from Daphne Crayne at the American Arbitration Association ("AAA") addressed to all parties regarding the administration of arbitration in this case.  *Id*. at ¶9, Ex. 5. Plaintiff was neither consulted nor made aware that Defendants intended to file a Demand for Arbitration or that they had already done so five days earlier on August 15.  *Id.* at ¶¶7, 9.  On September 4, 2019, after confirming that the Motion was pending in this Court, AAA stayed the administration of arbitration for 60 days, and it is currently stayed.  *Id.* at ¶¶11-12; Alderson Decl. ¶¶4-7.

### E. THE NEW YORK VALUATION LAWSUIT IS UNRELATED TO PLAINTIFF'S SEXUAL ASSAULT CLAIMS

Contrary to Defendants' posturing in the Motion, the pending litigation in New York state court (the "Valuation Case") is unrelated to Plaintiff's claims here. As described in the Motion, the "gravamen of that complaint is that…a higher value should have been assigned to Tinder."  Mot. at 11-12.  The complaint in the Valuation Case briefly recounts Blatt's alleged misconduct—and Defendants' sham investigation into it—as part of alleging the extent of Defendants' scheme to devalue Tinder.  Plaintiff's sexual assault does not give rise to a single claim or cause of action in the Valuation Case.

It was also in the context of the Valuation Case that Plaintiff learned for the first time that Defendants were claiming that she had signed a purportedly enforceable employment arbitration agreement.  After filing the Valuation Case containing the above-referenced allegations in August 2018, Plaintiff was forced to go on administrative leave at Tinder. ¶61.  Shortly thereafter, Defendants Match and IAC presented Plaintiff's counsel in that action with the Agreement.

7

Pambakian Decl., ¶6.  Plaintiff was not previously aware that she had signed an agreement to arbitrate.  *Id.*  Upon advice of counsel, Plaintiff voluntarily discontinued her claims in the Valuation Case without prejudice. *Id.* at ¶7.  Despite Defendants' mischaracterizations to the contrary, Plaintiff did not admit "to the press that she did so because Match's policy requires arbitration."  Mot. at 12:9-10.[3]

## III.   ARGUMENT

### A.   THE COURT MUST DECIDE WHETHER A VALID ARBITRATION AGREEMENT EXISTS AND WHETHER IT ENCOMPASSES CLAIMS ARISING FROM THE ASSAULT

As Defendants themselves admit, there is no dispute that the Court must decide "whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue."  *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004) (cited in Mot. at 13:21-23).  Under the Agreement, only questions about the "scope and application" of the Agreement are arbitrable.  Alcala Decl., Ex. B, § 13.  Plaintiff's arguments concerning the ***validity or enforceability*** of the Agreement, however, fall squarely within the purview of the Court—not an arbitrator—to decide.[4]

This Court's authority does not change merely because of the Agreement's purported "invocation of the rules of AAA."  Mot. at 16 n.5.  While incorporation

---

[3] In the interview cited by Defendants, Plaintiff states: "Just months after cheating Tinder employees out of billions of dollars, IAC / Match tried changing its policies in an attempt to force all current employees out of a public courtroom before a jury and into secret arbitration. IAC / Match did this only after carrying out their scheme. Let me be very clear: IAC / Match will be held accountable and we will continue to support the lawsuit 100% as it unfolds in New York state court."  *See Four Tinder Plaintiffs Drop Out of Lawsuit Because Match Might Have Quietly Changed Their Contracts*, The Verge (as updated September 4, 2018), *available at* https://www.theverge.com/2018/8/31/17805622/tinder-match-group-iac-lawsuit-plaintiffs-withdraw.

[4] An action to enforce an arbitration agreement is subject to the same defenses as any other breach of contract action.  *See* 9 U.S.C. § 2; *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010 (9th Cir. 2005).  Because this is a diversity action, the enforceability of the contract is governed by California law.  *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1280 (9th Cir. 2006).  Plaintiff may assert defenses against all Defendants, regardless of whether they are a party to, or a third party beneficiary of, the Agreement.  *See* 1 Witkin, Summary 11th Contracts § 715 (2019) ("any defense of the promisor against the promisee may be set up against the beneficiary").

8

of AAA rules *may* constitute "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability" under certain circumstances, this is not one of those circumstances.  *See Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013).  First, the Agreement does not incorporate the AAA rules; it merely notes that AAA rules are *one of many* ADR rules that *may* apply at the discretion of the parties. Alcala Decl., Ex. B, § 6.[5]  Second, under standard contract interpretation principles, the express delegation of issues about the "scope and application" of the Agreement bars any implication that the broader AAA delegation rules somehow apply.  Finally, as this Court—along with "the majority of district courts in the Ninth Circuit," *Eiess v. USAA Fed. Sav. Bank*, 2019 WL 3997463, at *7 (N.D. Cal. Aug. 23, 2019)—has previously held, even *express* incorporation of specific ADR rules does not constitute "clear and unmistakable" evidence of delegating arbitrability where the party against whom enforcement is sought is an "inexperienced individual[], untrained in the law." *Aviles v. Quik Pick Express, LLC*, 2015 WL 9810998, at *6 (C.D. Cal. Dec. 3, 2015) (Fitzgerald, J.), *vacated on other grounds,* 703 F. App'x 631 (9th Cir. 2017); *see also Tompkins v. 23andMe, Inc.*, 2014 WL 2903752, at *11-12 (N.D. Cal. June 25, 2014).  Given the clear "*presumption* that courts will decide which issues are arbitrable," the Agreement's mere reference to AAA rules that *may* apply in a contract that already expressly delineates the scope of delegation does not constitute "clear and unmistakable" evidence that Plaintiff—a woman not sophisticated in legalese and unfamiliar with alternative dispute resolution prior to this action—agreed to delegate the disputes raised in this Opposition to an arbitrator. *See Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 738 (9th Cir. 2014) (emphasis added) (citation omitted); *Armstrong v. Michaels Stores, Inc.*, 2018 WL 6505997, at *8 (N.D. Cal. Dec. 11, 2018) (the "clear and unmistakable standard is a high bar, and in the face

---

[5] For the avoidance of doubt that the Agreement does not expressly incorporate AAA rules, the Agreement references the "ADR provider" elsewhere in the Agreement—*not* the AAA. *See, e.g.,* Alcala Decl., Ex. B, § 7.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY LITIGATION**                                      **Case No. 2:19-cv-07053**

of ambiguity, courts should be reluctant to find delegation to the arbitrator");
Pambakian Decl., ¶4.

### B.   THE COURT SHOULD DENY THE MOTION BECAUSE THE AGREEMENT IS INVALID AND UNENFORCEABLE

#### 1.   The Agreement Does Not Apply Retroactively To Plaintiff's Claims

Plaintiff's claims are not subject to arbitration because they predate the Agreement.  Plaintiff was sexually assaulted by Blatt in 2016, and Defendants conducted their sham "investigation" into the circumstances surrounding Blatt's assault in 2017.  SOF §§ A-B; ¶¶15-19, 37-40.  However, the Agreement did not become effective until February 1, 2018, years after Plaintiff's claims first accrued.  Alcala Decl. Ex. B, § 16.6.  Defendants, nonetheless, argue that "Plaintiff's claims are covered under the Agreement" because the Agreement applies retroactively.  Mot. at 14.  This argument is wholly unsupported and should be rejected.

The Agreement's plain terms establish that it does not apply retroactively.  The Agreement covers "all claims or controversies involving or in any way concerning Associate's application with, employment with, or termination from, the Company."  Alcala Decl., Ex. B, § 2.  The operative verbs in this clause— "involving" and "concerning"—are each present participles, which "typically express *present* action," *not* past action.[6]  Courts considering similar arbitration provisions containing present participles have held that these provisions only apply prospectively, not retroactively as Defendants argue.  For example, in *Morse v. ServiceMaster Global Holdings Inc.*, the court held that an arbitration agreement that applied to claims "'arising out of or related to Employee's employment'" did not apply retroactively because "use of the present participle 'arising' makes it clear that it applies to claims that may arise going forward, not claims that have already accrued."  2012 WL 4755035, at *5 (N.D. Cal. Oct. 4, 2012).  Just like in

---

[6]   *See*   Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/present%20participle (emphasis added).

10

*Morse*, use of present participles in the Agreement means that the Agreement does not apply to Plaintiff's claims because they accrued prior to the effective date of the Agreement. *See also Russell v. Citigroup, Inc.*, 748 F.3d 677, 679 (6th Cir. 2014) ("use of the present-tense 'arise'…suggests that the contract governs only disputes that begin [] in the present or future"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 3353867, at *1 (N.D. Cal. Aug. 3, 2011) (claims accruing before effective date not subject to arbitration based on clause "'all disputes arising out of, relating to, or in connection with'" agreement).

Even if the Agreement's language by itself does not refute Defendants' retroactivity argument (which it does), Defendants' argument would still fail because the Agreement does not explicitly state that it applies retroactively. For an arbitration agreement to apply retroactively, the agreement must contain "'express, unequivocal language'" to that effect. *Long v. Fid. Water Sys., Inc.*, 2000 WL 989914, at *3 (N.D. Cal. May 26, 2000) (declining to apply agreement prior to effective date of agreement); *see also Mohebbi v. Khazen*, 2014 WL 6845477, at *10 (N.D. Cal. Dec. 4, 2014) (declining to enforce "arbitration clause [that] does not ***explicitly*** encompass claims that predate the signing of the" agreement) (emphasis added). There is nothing in the Agreement that expressly provides for retroactive application.

The absence of any retroactivity provision is particularly telling in light of ***other*** arbitration agreements ***used by Defendants***. In Tinder's "Terms of Use," the arbitration agreement is set forth under the heading "***Retroactive*** and Prospective Arbitration, Class Action Waiver, and Jury Waiver," and uses the word "retroactive" ***eleven times*** in that section, often in bold and/or all caps. Graham Decl., Ex. 7 at §15 (emphasis added). Defendants clearly know how to draft an arbitration agreement that reflects retroactivity, so the fact that they did not explicitly and prominently provide for such in the Agreement reflects that the

11

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO**
**COMPEL ARBITRATION AND DISMISS OR STAY LITIGATION**                    **Case No. 2:19-cv-07053**

parties **did not** intend for the Agreement to apply retroactively. Thus, the Agreement does not apply to Plaintiff's claims.

Defendants' argument that *Sanfilippo v. Tinder, Inc.*, 2018 WL 6681197 (C.D. Cal. Dec. 18, 2018) controls the retroactivity analysis should be rejected. Mot. at 8-9. First, although that court purported to analyze the Agreement, the court actually analyzed the **summary** of the Agreement (*id.* at *4)—which contains **different** language than the Agreement itself. *Compare* Alcala Decl., Ex. A, § 1 (summary states that Agreement covers claims "arising out of or in connection with" employment), *with* Alcala Decl., Ex. B, § 2 (Agreement applies to claims "involving or in any way concerning" employment). But as the summary itself provides, the language of the actual Agreement, not the language in the summary, controls. Alcala Decl. Ex. A, § 5. Because the *Sanfilippo* court did not even analyze the terms of the controlling Agreement—and largely rested on the "in connection with" language that is absent from the Agreement itself—*Sanfilippo* is not persuasive. 2018 WL 6681197 at *5. Second, the court did not consider how the use of present participles in the Agreement affects the retroactivity analysis. Instead, the court simply noted that the Agreement covers a "broad scope of disputes," *id.*, but ignored that the operative clause only "refers to the *material* scope of the arbitration agreement, not *temporal* scope." *Morse*, 2012 WL 4755035, at *4 (emphasis in original). Finally, while the court mentioned the Tinder "Terms of Use," it conducted **zero analysis** regarding its implications on the Agreement. Because *Sanfilippo*'s reasoning is fatally flawed, it should not be followed by this Court.[7]

### 2.    The Agreement Is Unconscionable

The Agreement is also unenforceable because it is procedurally and substantively unconscionable. *Armendariz v. Foundation Health Psychcare*

---

[7] Defendants' reliance on *Salgado v. Carrows Rests., Inc.*, 33 Cal. App. 5th 356 (2019) is also misplaced. Mot. at 15. The *Salgado* court relied on a term in an agreement ("related") that is absent from the relevant provision of the Agreement here. *See* 33 Cal. App. 5th at 360.

*Services, Inc.*, 24 Cal. 4th 83, 114 (2000) ("Because unconscionability is a reason for refusing to enforce contracts generally, it is also a valid reason for refusing to enforce an arbitration agreement…."). An unconscionability analysis begins with an inquiry as to whether the contract in question is one of adhesion. *Id.* at 88. The Agreement here is a contract of adhesion: it was a standardized form document, prepared by Match, and circulated "to Plaintiff and other California employees" to sign without any opportunity for negotiation. Alcala Decl. ¶7; *id.* at Ex. C; SOF § B; *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1534 (1997) (finding arbitration agreement to be one of adhesion where high-ranking executive employee had no realistic ability to modify the terms); *id.* at 1533 (a contract of adhesion is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it") (internal quotation marks and citation omitted). As Plaintiff's employer, Match had superior bargaining power over Plaintiff, and she believed that she had no choice but to sign the stack of electronic documents that included the Agreement in order to remain employed. Pambakian Decl., ¶¶3-4; *see Fitz v. NCR Corp.*, 118 Cal. App. 4th 702, 722 (2004) ("Few employees are in a position to forfeit a job and the benefits they have accrued … solely to avoid the arbitration terms that are forced upon them by their employer.").

A contract of adhesion is unenforceable when it is both procedurally and substantively unconscionable. *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1107 (C.D. Cal. 2002). While both procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse enforcement of a contract, they "need not be present in the same degree." *Armendariz*, 24 Cal. 4th at 114. Instead, a sliding scale is invoked. For example, if the contract contains terms that are substantively oppressive, then less evidence of procedural unconscionability is required, and vice versa. *Id.* Here, the

13

Agreement is both procedurally and substantively unconscionable and should not be enforced.

### (a)    The Agreement Is Procedurally Unconscionable

Procedural unconscionability "addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power." *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223, 246 (2012); *id.* at 247 ("'Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form.'"); *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 893 (9th Cir. 2002) (finding arbitration agreement procedurally unconscionable because it was a "take it or leave it" prerequisite to employment, and job applicants could not modify the agreement's terms). As discussed in detail above, the timing and circumstances by Plaintiff and other employees were forced to sign the Agreement make it procedurally unconscionable. SOF § B. In context, it is clear that Match forced the arbitration agreement on employees to create a mechanism by which it could try to silence Plainiff about the sexual assault by Match's CEO, Defendant Blatt. And despite this being a new policy to Tinder employees, Match never "openly and thoroughly described" the existence or impact of the policy to employees prior to giving it to Plaintiff and others to sign.[8] Pambakian Decl., ¶¶4-5; see *Fitz*, 118 Cal. App. 4th at 722. No one discussed with Plaintiff the terms of the Agreement, asked whether she understood them, or asked if she had any questions. *Id.* at ¶4. Plaintiff had no opportunity to negotiate the terms of the

---

[8] Tinder did not have an arbitration agreement or ADR policy with employees prior to Match imposing one in late 2017/early 2018. Pambakian Decl., ¶5.

14

Agreement.  *Id.*[9]  In fact, Plaintiff did not even know what an alternative dispute resolution policy was until after she filed the Valuation Case.  *Id.* at ¶¶4, 6.

The Agreement also is procedurally unconscionable because of the uncertainty and hidden nature of the applicable rules.  Where there is either ambiguity regarding "which set of arbitration rules govern[]" or the applicable rules are "artfully hidden" because they are "not attach[ed]" to the agreement, then the agreement is procedurally unconscionable.  *See Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1405 (2003).  Both problems are present here.  The Agreement provides that any arbitration will proceed "in accordance with the applicable arbitration rules and procedures of the American Arbitration Association (AAA) or another alternative dispute resolution (ADR) provider selected by the parties." Alcala Decl., Ex. B, § 6.  Thus, on its face, the Agreement does not disclose "which set of arbitration rules govern[]."  *Harper*, 113 Cal. App. 4th at 1406-07.[10]  Nor does the Agreement clearly state that Plaintiff's employer could unilaterally select an ADR provider, which is precisely what Defendants did here.  Graham Decl., ¶¶7, 9.  Additionally, the applicable rules are "artfully hidden."  Defendants take the position that the AAA Employment Rules govern their dispute with Plaintiff (again, despite the rules being silent on this issue).  Hayes Decl., Ex. 1 at Hayes-5. But the AAA Employment Rules, in turn, require the parties to submit to a confidential arbitration, even though the Agreement itself imposes no such requirement.  Graham Decl., Ex. 8, Rule 23.

---

[9] A plaintiff is not "required, as a prerequisite to finding procedural unconscionability, that [she] show [she] tried to negotiate standardized contract provisions."  *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 914 (2015).

[10] The Court should also void the Agreement for failure to specify the rules to be applied in an arbitration.  *See Flores v. Nature's Best Distribution, LLC*, 7 Cal. App. 5th 1, 10-11 (2016) (agreement to arbitrate before AAA voided because no meeting of the minds on applicable rules). Even worse, the Agreement also fails to specify the ADR provider.  Therefore, the Court should not enforce the Agreement because "the intention of the parties in material particulars cannot be ascertained."  *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 209 (2006) (internal quotation marks and citation omitted).

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY LITIGATION**

Case No. 2:19-cv-07053

Defendants also never provided Plaintiff with a copy of the full set of arbitration rules under which she would be bound.  Pambakian Decl., ¶3.  Instead, the summary document directed Plaintiff to go outside that document to review the full terms of the Agreement.  Alcala Decl., Ex. A at Alcala-6.  Courts have routinely held arbitration agreements as procedurally unconscionable where the plaintiff was not provided with a copy of the arbitration rules to which the employee will be bound.  *See, e.g., Fitz*, 118 Cal. App. 4th at 701, 721 (2004) (NCR's "employee-dispute resolution policy, known as Addressing Concerns Together (ACT)," incorporated "arbitration rules that were not attached and require[d] the other party to go to another source in order to learn the full ramifications of the arbitration agreement"); *Harper*, 113 Cal. App. 4th at 1406-1407 (2003) ("inability to receive full relief is artfully hidden by merely referencing the Better Business Bureau arbitration rules, and not attaching those rules to the contract for the customer to review[,]" which forced the customer to go to another source to learn that the arbitration agreement curtailed his ability to receive full relief); *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 84 (2003) (Gutierrez "never given or shown a copy of the arbitration rules of the American Arbitration Association (AAA), the designated arbitration provider"); *Patterson v. ITT Consumer Financial Corp.*, 14 Cal. App. 4th 1659, 1665 (1993) (at signing, "borrowers were not given a copy of the procedural rules of the National Arbitration Forum (NAF); the rules were sent to the borrowers only once ITT had initiated a claim against them").  Moreover, while Plaintiff may have had the option to download the DocuServe file after she completed it (which only included the summary of the Agreement), Plaintiff does not recall doing so, and no one ever gave her a final executed copy of the Agreement.  Pambakian Decl., ¶3.  Because the Agreement is a "take it or leave" contract chock-full of hidden terms, the Agreement is procedurally unconscionable.

**(b)** **The Agreement Is Substantively Unconscionable**

"Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." *Magno v. College Network, Inc.*, 1 Cal. App. 5th 277, 284 (2016). The Agreement is substantively unconscionable because it is biased and provides Defendants with unilateral powers that are not reciprocated to Plaintiff. *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) ("Unconscionability refers to 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'").

First, requiring Plaintiff's arbitration to be confidential is unconscionable. *See Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1078-79 (9th Cir. 2007) (abrogated on other grounds) (confidentiality clause in arbitration agreement substantively unconscionable). As discussed above, the Agreement arose just a few months after Plaintiff refused to accept hush money in exchange for signing a non-disclosure/disparagement agreement regarding Blatt's sexual assault and the deficient investigation that followed and Plaintiff's refusal to throw a reporter off the trail of exposing Blatt's assault. SOF § B; ¶¶47-49. After Plaintiff repeatedly rejected Defendants' attempts to keep her silent and cover up Defendants' misconduct, Defendants made Plaintiff sign the Agreement and now try to use it— based on AAA Employment Rules that were never referenced in the Agreement— to backdoor in a confidentiality obligation that they were unable to secure voluntarily. The AAA confidentiality provision has the effect of protecting sexual predators and the corporate cultures that refuse to remove these predators from their positions of power. In this context, the Agreement's confidentiality requirement is overly harsh and renders the Agreement unconscionable.[11] *See De*

---

[11] The savings clause in AAA Employment Rule 23 (enforcing confidentiality unless "the law provides to the contrary") does not fix the unconscionability of the provision. *See O'Melveny & Myers*, 485 F.3d at 1079 (rejecting similar savings clause because "[n]o existing rule of contract law permits a party to resuscitate a legally defective contract merely by offering to change it") (internal quotation marks and citation omitted).

17

*La Torre v. CashCall*, 5 Cal. 5th 966, 976 (2018) (must consider "process by which the contractual parties arrived at the agreement and the larger context surrounding the contract" in evaluating unconscionability).

Second, the Agreement provides a unilateral right for Defendants to amend, modify, change, or revoke the agreement without providing Plaintiff any corresponding right.  Section 16.3 of the Agreement states that the "Program can be modified or revoked in writing ***only by the Company's corporate general counsel or chief human resources officer***[,]" while "***[n]o employee*** of the Company can orally amend, modify or change the terms of this Program."  Alcala Decl., Ex. B (emphasis added).  This provision is unconscionable because it proscribes Plaintiff's ability to terminate or modify the contract.  *Circuit City*, 328 F.3d at 1179 ("by granting itself the sole authority to amend or terminate the arbitration agreement, Circuit City proscribes an employee's ability to consider and negotiate the terms of her contract."); *id.* at 1179 (therefore, "the provision affording Circuit City the unilateral power to terminate or modify the contract is substantively unconscionable."); *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1462 (2012) (this unconscionability persists "regardless of whether or not the employer has *exercised* its unilateral right to amend, modify, or terminate the agreement; it is the *ability* to do so that matters.") (emphasis in original).

Third, any delegation of questions concerning the Agreement's enforceability to an arbitrator is unconscionable.  Defendants argue that their "invocation of the rules of AAA…'constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.'"  Mot. at 16 n.5.  Defendants' reading of the Agreement suggests that an arbitrator must determine the "existence, scope or validity of the arbitration agreement," including the enforceability of the Agreement, because of the supposed incorporation of AAA rules.  *See* Graham Decl., Ex. 8, Rule 6(a); *Brennan v. Opus Bank*, 796 F.3d 1125, 1133 (9th Cir. 2015) ("incorporation of the AAA rules [] delegates enforceability questions to the

18

arbitrator").   But the Agreement *does not* "clearly and unmistakably" delegate questions about the validity and enforceability of the Agreement to an arbitrator because the Agreement's explicit delegation provision only puts questions about the "scope and application" of the Agreement—not its validity or enforceability— before an arbitrator.  Alcala Decl., Ex. B, § 13.  Thus, to the extent the Agreement could be read to delegate all questions of arbitrability to an arbitrator, that delegation is substantively unconscionable because it would deviate from the Agreement's express terms and thus be unjust to enforce in this context.

Fourth, the Arbitration Agreement carves out a right to utilize the court system for claims "arising out of or related to the unauthorized use, disclosure or misappropriation of the confidential and/or proprietary information of either party."  Alcala Decl., Ex. B, § 3.  While the Agreement, on paper, does provide Plaintiff with the same right, in practice this provision is overwhelmingly one-sided, as Defendants are far more likely than Plaintiff to have inventions, trade secrets, or other confidential information that would benefit from this protection. Courts have found arbitration agreements to be unfairly one-sided where, like here, they compel arbitration of claims more likely to be brought by the weaker party but exempt from arbitration the types of claims that are more likely to be brought by the stronger party.  *Fitz*, 118 Cal. App. 4th at 724; *Mercuro v. Superior Court,* 96 Cal. App. 4th  167, 176 (2002) (court found unfairly one sided an arbitration agreement that covered "some employment-related claims including employment discrimination but excluded others such as … equitable relief for unfair competition, unauthorized disclosure of trade secrets or violation of intellectual property rights").

Finally, assuming the Agreement applies retroactively, such a clause is substantively unconscionable.  Because Blatt sexually assaulted Plaintiff in 2016, and Defendants' deficient investigation and cover up occurred throughout 2017, Plaintiff could have brought claims in court well before signing the Agreement in

19

2018.  However, instead of rushing to court to seek relief—as was her right—Plaintiff first attempted to resolve her claims informally by following her employer's process.  *See, e.g.*, ¶¶24-43.  Defendants repaid Plaintiff's attempt to be a good corporate citizen by slipping an individual arbitration agreement into a package of corporate policies and demanding that she sign them.  They did this without disclosing their belief that they could use the arbitration agreement to deny Ms. Pambakian her day in court (simply because she did not sue them fast enough) and despite her earlier statement that she was seeking an attorney to represent her regarding the exact matter to which Defendants now claim (with no support in the Agreement itself) the Agreement retroactively applies.  Because the purported retroactivity clause operates to penalize a victim of sexual assault for voluntarily following corporate procedures before instituting legal action, the Agreement is unconscionable.

Because the Agreement is both procedurally and substantively unconscionable, the Court should not enforce the Agreement.  Although the Court may in its discretion either sever unconscionable provisions or refuse to enforce the agreement, California courts generally bar enforcement of an agreement—like the one here—that is "permeated by unconscionability."  *Carbajal v. CWPSC, Inc.*, 245 Cal. App. 4th 227, 254 (2016).  "An employment arbitration agreement can be considered permeated by unconscionability if it contains *more than one* unlawful provision."  *Id.* (internal quotation marks and citation omitted) (emphasis in original).  Thus, in *Carbajal*, the court upheld refusal to enforce an arbitration agreement that "contain[ed] three substantively unconscionable terms"—which is fewer than the amount of unconscionable terms challenged here.  *Id.*  Because it would be unjust to enforce the unconscionable Agreement, the Court should deny the Motion.

### (c) Public Policy Concerns Warrant Denying The Motion To Compel Arbitration

Forcing Plaintiff, a sexual assault victim, into confidential arbitration also would violate public policy. In the wake of the #MeToo movement, public policy concerns over mandated arbitration of claims involving sexual assault and harassment have sparked a legislative response. Just last week, on Friday, September 20, the U.S. House of Representatives passed the bi-partisan Forced Arbitration Injustice ("Fair") Act to combat situations such as this. The Fair Act will ban businesses from including mandatory arbitration clauses requiring employees and consumers to resolve legal disputes in silent, confidential, private arbitration. It will also invalidate current agreements with mandatory arbitration clauses.

After the #MeToo movement brought the issues of forced arbitration to light in the context of sexual assault, many major tech corporations, such as Google and Uber, have **voluntarily** withdrawn their policies mandating arbitration of such claims. Match, on the other hand, has made no such efforts. Instead, Match added an arbitration clause to their employment policies in the wake of a sexual assault with the sole purpose of silencing the victim and forcing her into a biased arbitration program. Match's policy should not be enforced.

### C. DEFENDANTS CANNOT ENFORCE THE AGREEMENT BECAUSE THEY ARE IN BREACH

Even assuming the Agreement is valid and enforceable—which it is not—the Motion also should be denied because Defendants breached the Agreement. It is "[a] bedrock principle of California contract law [] that '[h]e who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed.'" *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010 (9th Cir. 2005) (quoting *Pry Corp. of Am. v. Leach*, 177 Cal. App. 2d 632, 639 (1960)); *see Wiz Tech., Inc. v. Coopers & Lybrand*, 106 Cal. App. 4th 1, 12 (2003) ("It is well settled that the breach of an important condition

21

may excuse the other party from performance."). In *Brown*, the Ninth Circuit applied this principle to deny a motion to compel arbitration by an employer who breached its arbitration agreement by refusing to respond to an employee's arbitration demand. *See Brown* at 1010 ("Dillard's breach of its obligations under the arbitration agreement deprives it of the right to enforce that agreement.").

Just like the defendant in *Brown*, Blatt "clearly breached the arbitration agreement" by filing his defamation complaint against Plaintiff in federal court. *See id.*; Graham Decl., Ex. 3.   Defendants cannot dispute this because Blatt explicitly admits in his demand for arbitration that these very defamation claims are covered by the Agreement.   Hayes Decl., Ex. 2, ¶5.   Blatt also admits that his defamation case is "related" to this action.   *Id.* at Hayes-2, Hayes-58.   Because Blatt breached the Agreement by filing his defamation complaint, he cannot enforce the Agreement against Plaintiff in this related action.

Additionally, all of the Defendants breached the Agreement by filing a consolidated arbitration demand against Plaintiff.   The Agreement states:   any "arbitration shall proceed solely on an individual basis without the right for any claims to be arbitrated as a class, consolidated, collective or representative action. Claims may not be joined or consolidated unless agreed to by all parties in writing." Alcala Decl., Ex. B, § 2.   Despite this provision, Defendants jointly filed a single arbitration demand against Plaintiff regarding the claims in this action without her knowledge or consent.   Hayes Decl., Ex. 1 at Hayes-5; Graham Decl., ¶¶7, 9.

This is a breach of the plain terms of the Agreement.   First, there can be no dispute that Match, IAC, and Blatt are three separate parties.   Mot. at 17 (distinguishing Match from separate "third parties" IAC and Blatt).   Thus, their arbitration demand was not made on "an individual basis."   Second, by requesting arbitration of Plaintiff's claims in a single proceeding, Defendants attempt to bring a consolidated action.   *See* Wright & Miller, 9A Fed. Prac. & Proc. Civ. § 2382 (3d ed.) ("[i]n the context of legal procedure" consolidations means, *inter alia*,

22

combining actions such as when "several actions are pending between the same parties stating claims that might have been set out originally as separate counts in one complaint"); *see generally id.* § 2384 (consolidation occurs when actions involving same set of parties based on overlapping facts are combined). Defendants' breach of this material provision of the Agreement excuses Plaintiff from performing under the Agreement. *See Wiz Tech.*, 106 Cal. App. 4th at 12 ("It is well settled that the breach of an important condition may excuse the other party from performance."); *Sanchez v. W. Pizza Enterprises, Inc.*, 172 Cal. App. 4th 154, 181, (2009) (abrogated on other grounds) (waivers of group proceedings "are important provisions").

Defendants also breached the Agreement by filing a demand with the AAA without first meeting and conferring with Plaintiff.  The Agreement states that the arbitration will take place before "the American Arbitration Association (AAA) or another alternative dispute resolution (ADR) provider **selected by the parties**." Alcala Decl. Ex. B, § 6 (emphasis added).  Defendants filed their arbitration demand with the AAA without consulting with Plaintiff.  Graham Decl., ¶¶7, 9. Plaintiff thus had no role in "select[ing]" the ADR provider or the rules governing the ADR process as contemplated by the Agreement.  Defendants' actions violated Plaintiff's contractual rights, and—together with their other breaches—require denial of the Motion.

### D.   BLATT WAIVED HIS RIGHT TO ENFORCE THE AGREEMENT

While the Motion should be denied as to all Defendants, Blatt also cannot enforce the Agreement because he waived his right to arbitrate by filing suit against Plaintiff in federal court.  "[A] party seeking to prove waiver of a right to arbitration must demonstrate: (1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." *Martin v.*

23

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO**     **Case No. 2:19-cv-07053**
**COMPEL ARBITRATION AND DISMISS OR STAY LITIGATION**

*Yasuda*, 829 F.3d 1118, 1124 (9th Cir. 2016) (internal quotation marks and citation omitted).  Each of these elements is established here.

First, Blatt's arbitration demand evidences his knowledge of his right to arbitrate.  Second, Blatt's filing of a court action is inconsistent with his supposed right to arbitrate.  *See Steiner v. Horizon Moving Sys., Inc.*, 2008 WL 4822774, at *3 (C.D. Cal. Oct. 30, 2008) ("The second requirement for waiver exists here, as Plaintiff has acted inconsistently with the existing right by filing a lawsuit in lieu of seeking arbitration of [his] claims.").  Indeed, Blatt has continued litigating his defamation action in court, more than a month and a half after filing his complaint, instead of dismissing it to solely pursue arbitration.  Finally, Plaintiff has suffered prejudice.  Prejudice is established when parties "have incurred costs that they would not otherwise have incurred" or when "defendants have received an advantage from litigating in federal court that they would not have received in arbitration."  *Martin*, 829 F.3d at 1126.  Blatt has gained an unfair advantage by getting a preview of Plaintiff's arguments, which he can now use to craft his legal strategy in the arbitration.  Additionally, by litigating parallel actions in court and arbitration, Blatt is attempting to see which forum provides him with the best result.  This is precisely the type of unfair gamesmanship that establishes prejudice, and the Motion should be denied as to Blatt.  *See Steiner*, 2008 WL 4822774, at *3 (prejudice based on forum shopping).

### E.  DEFENDANTS' EQUITABLE ESTOPPEL ARGUMENT MUST BE REJECTED

Defendants' argument that Plaintiff is equitably estopped from opposing arbitration should be rejected because it is based on a misreading of the law. Defendants argue that Plaintiff cannot avoid arbitration because her claims "are premised on application of Match's policies and inextricably intertwined with those policies."  Mot. at 19.  But the cases cited by Defendants make clear that equitable estoppel only applies when claims are "inextricably bound up with the

24

contractual obligations of the agreement **containing the arbitration clause**." *Goldman v. KMPG LLP*, 173 Cal. App. 4th 209, 214 (2009) (emphasis added); *see also Boucher v. Alliance Title Co., Inc.*, 127 Cal. App. 4th 262, 272 (2005) ("[b]y relying on contract terms…a plaintiff may be equitably estopped from repudiating the arbitration clause **contained in that agreement**") (emphasis added).  Because Plaintiff is not basing her claims on the Agreement, Defendants' argument is meritless and poses no barrier to denying the Motion.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion.

Dated:  September 25, 2019

M. Elizabeth Graham (SBN 143085)
Kimberly A. Evans (*pro hac vice* pending)
Paige Alderson (admitted *pro hac vice*)
**GRANT & EISENHOFER P.A.**
One Market Street
Spear Tower, 36th Floor
San Francisco, CA 94105
Tel:  415-293-8210
Fax: 415-789-4367
egraham@gelaw.com
kevans@gelaw.com
palderson@gelaw.com

*Counsel for Plaintiff*